UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                 :

666 DRUG, INC., *formerly known as* MELROSE     :
PHARMACY, a New York corporation,            :                12 Civ. 1251 (PAE)
                                 :
                 Plaintiff,       :             OPINION & ORDER
                                 :

                 -v-                  :
                                 :

THE TRUSTEE OF 1199 SEIU HEALTH CARE     :
EMPLOYEES PENSION FUND,               :
                                 :
                 Defendant.     :
                                 :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff 666 Drug, Inc., formerly known as Melrose Pharmacy ("Melrose"), seeks here to

vacate an arbitration award.  The award affirmed an assessment of withdrawal liability made

upon Melrose under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. §§ 1001–1461, *amended by* the Multiemployer Pension Plan Amendment Act of 1980

("MPPAA"), 29 U.S.C. §§ 1381–1461, by the Trustee of 1199 SEIU Health Care Employees

Pension Fund (the "Fund"), the defendant here.  The effect of the award was to find Melrose

liable to pay $846,613 to the Fund in withdrawal liability.

      Until January 1999, Melrose was party to a collective bargaining agreement with

1199SEIU United Healthcare Workers East (the "Union") and a contributing employer to the

Fund, pursuant to a collective bargaining agreement ("CBA").  The CBA expired in January

1999 and was never renegotiated.  Nevertheless, Melrose continued making contributions to the

Fund at the expired rates until November 2010.  At that time, the Union disclaimed interest in

representing Melrose employees, and the Fund thereafter assessed withdrawal liability upon

Melrose.  Melrose filed this action to challenge the Arbitrator's confirmation of the Fund's determination of withdrawal liability.  For the reasons stated above, Melrose's motion to vacate the Arbitrator's award is denied.

## I.      Background

### A.      Procedural History

On October 5, 2011, the Fund assessed withdrawal liability on Melrose in the amount of $846,613.  Withdrawal liability is the amount a participating employer in a multiemployer pension plan must pay upon complete or partial withdrawal from the plan.  "The purpose of this withdrawal liability, which is enforceable in a suit by the pension plan, 'is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'"  *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 200 (S.D.N.Y. 2012) (quoting *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 161 n.2 (2d Cir. 2012)).  "An employer's withdrawal liability is equal to the employer's proportionate share of the plan's unfunded vested employee benefits. The unfunded vested benefits are calculated as the difference between the present value of vested benefits and the current value of the pension plan's assets."  *Park S. Hotel Corp. v. N.Y. Hotel Trades Council*, 851 F.2d 578, 580 (2d Cir. 1988).  "Under the MPPAA, the employer pays its withdrawal liability in annual installments, which are calculated based on the employer's historical contribution amounts."  *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 130 (2d Cir. 2012) (citing 29 U.S.C. §§ 1391(c), 1399(c)).

On November 14, 2011, as contemplated by the MPPAA, *see* 29 U.S.C. § 1399(b)(2)(A), Melrose requested review of the Fund's determination.  On January 9, 2012, the Fund sent Melrose a letter confirming its assessment.

On February 17, 2012, Melrose filed the Complaint in this case.  It sought a declaratory judgment that (1) Melrose was not liable for the withdrawal liability, and (2) the Fund's assessment of withdrawal liability was not arbitrable.  Dkt. 1.  On February 28, 2012, Melrose initiated arbitration proceedings, challenging the Fund's assessment of withdrawal liability. Simultaneously, Melrose filed a proposed order to show cause in this case seeking a stay of the arbitration and a stay of its obligation to pay withdrawal liability.  Dkt. 2–8.

On April 4, 2012, the Honorable Barbara S. Jones, to whom this case was previously assigned, ordered that the parties arbitrate their dispute as to withdrawal liability.  She also directed Melrose to continue to make withdrawal liability payments while the arbitration was pending, as required by the MPPAA.  Dkt. 22, *available at 666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*, No. 12 Civ. 1251 (BSJ), 2012 WL 1142464 (S.D.N.Y. Apr. 4, 2012) (the "OTSC Op.").

On July 26, 2012, the Arbitrator received evidence and heard argument.  On September 10, 2012, he issued a decision in favor of the Fund.  *See* Dkt. 28, Ex. A (the "Arbitrator's Award," or "Award").  The Award found that Melrose had completely withdrawn from the Fund in 2010.  The Award affirmed the Fund's assessment of withdrawal liability in the amount of $846,613.  *Id.* at 19.   The Award also directed Melrose to continue paying the withdrawal liability on the schedule set by the Fund—that is, in 80 quarterly installments of $17,029.  *Id.*

On October 15, 2012, Melrose filed the instant motion seeking to vacate the arbitration award, Dkt. 27, and its brief in support, Dkt. 29 ("Pl. Br.").  On December 4, 2012, the Fund filed a brief in opposition.  Dkt. 31 ("Def. Br.").  On December 14, 2012, Melrose filed its reply. Dkt. 35 ("Pl. Reply Br.").  On May 29, 2013, this case was reassigned to this Court.  Dkt. 36.

**B.      Facts**

The facts, as set out by the arbitrator in his decision, are largely undisputed.  And the Court, on a challenge to an arbitral decision, must accept the arbitrator's factual findings unless it finds clear error by a preponderance of the evidence.  *See* discussion *infra* Part II.  No such showing has been made here.  The Court therefore adopts the facts recited in the arbitral award, which form the basis for the following summary.

Before 1999, Melrose was a member pharmacy in the Empire State Pharmaceutical Society (the "Society").  As part of the Society, Melrose, for many years, had been a party to a collective bargaining agreement ("CBA") with 1199SEIU United Healthcare Workers East (the "Union").  Award 5–6.  James Detura became Melrose's owner in 1989 and was its owner during all times relevant here.

The Fund is a multiemployer pension benefit plan associated with the Union.  While Melrose was party to the CBA with the Union, it also contributed to its related Funds.  In the 1950s, Melrose began contribution to the Health Fund, and in 1970, began contributing to the Pension Fund in its present form (the defendant here).  Award 5.

On January 31, 1999, the CBA expired.  The Society had, by then, dissolved.  Thereafter, a number of individual stores, including Melrose, agreed to be represented by Jerome Sager, Esq., formerly Executive Director and General Counsel of the Society, for the purpose of negotiating a new CBA with the Union.  But, despite Sager's attempts, no negotiations took place, and no successor CBA was either negotiated or entered into.

Notwithstanding the expiration of the CBA, from February 1999 forward, Melrose paid monthly contributions to the Union for its employees and submitted payroll reports for them.  Melrose paid at the rate set by the expired CBA.  Award 7, 9.  Detura testified that he did so on

Sager's advice that Melrose was required to do so.  Detura testified: "Through conversation with Mr. Sager and—and eventually written letters, Mr. Sager advised me that I am obligated to make the contributions to both the benefit fund and the pension fund based on the rates of the old, expired contract." *Id.* at 7 (quoting Detura Dep. 36–37).

In 2003, the Fund notified Detura that Melrose should pay contributions at a higher rate. Sager, however, advised Detura that Melrose was not required to do so.  In a letter to Detura dated July 21, 2003, Sager explained:

> I have been unsuccessful to this point [in negotiating a new CBA] and have decided not to pursue it further with them.  *The reason being that all the stores in my bargaining group are saving money every day by not having to give increases and not having to pay higher pension and welfare contributions.  While you are still obligated to continue making payments to the funds, they are at the rate in existence at the last contract.* When and if they contact me, I will of course meet with them to try and reach an agreement.  Until that time, things remain as is.

Award 8 (emphasis in original) (quoting Melrose Ex. 3).  On the basis of this advice, Melrose continued to pay contributions to the Fund, but not at the increased rate sought by the Fund, which sent Melrose balance-due statements premised on a higher rate.  The Fund never acted to collect shortfalls from Melrose.  Award 9.

In 2009, the Fund entered "critical status" as defined by the Pension Protection Act ("PPA") of 2006, Pub. L. 109–280, 120 Stat. 780 (2006).  Award 10.  Under the PPA, a plan "is in critical status if, *inter alia*, it is less than sixty-five percent funded."  *F.W. Honerkamp Co.*, 692 F.3d at 130 (citing 29 U.S.C. § 1085(b)).  If a plan goes into critical status, it must adopt a rehabilitation plan, assess a surcharge on contributions under the CBA, and take other actions to avoid insolvency, including reducing benefits.  *Id.* at 130–31.  As required by the PPA, Melrose was given notice of this change; when requested to do so, it paid a one-time surcharge to the Fund.  However, in 2009, when the Fund requested that Melrose sign a Participation Agreement,

which set out new rates, Melrose did not enter into it.  Instead, Melrose continued to pay contributions at the rates set by the expired CBA.

During the 11-year period in which Melrose paid contributions at the rate of the expired CBA, more than a dozen Melrose employees became vested in pension benefits from the Fund. *See* Award 11, 17.

In July 2010, Melrose was preparing to be acquired by Duane Reade, Inc.  In connection with that acquisition, Melrose requested a withdrawal liability estimate from the Fund.  The request from Melrose's counsel to the Fund's general counsel, by email, stated that the counsel "represents Melrose Pharmacy, *which is a participating employer* in the 1199 Pension Fund." Award 10 (emphasis added by Arbitrator) (quoting Fund Ex. 10).  The Fund responded by estimating Melrose's withdrawal liability at $796,714.00.  Award 11.

At Duane Reade's request, a representative of Melrose also met with a representative of the Union, to assess the obligations that Melrose had, if any, to the Union.  Thereafter, on November 9, 2010, Laurie Vallone, a vice president of the Union, sent a letter to Detura.  It stated, in its entirety:  "The Union has not had a contract with your Pharmacy for over ten years and the workers have not paid dues for some time, therefore we are disclaiming interest."  Award 11 (quoting Melrose Ex. 8).

On October 5, 2011, the Fund assessed withdrawal liability of $846,613 on the basis of its conclusion that Melrose had completely withdrawn from the Fund in 2010.  Award 1, 4.  On November 14, 2011, after Melrose requested that it reconsider, the Fund confirmed the assessment of withdrawal liability.

On September 10, 2012, the Arbitrator issued his Opinion and Award in the Fund's favor. The critical decision made by the Arbitrator was as to the date of Melrose's withdrawal:  Was it

6

in 1999, when the CBA expired, as Melrose argued?  Or was it in 2010, as the Fund argued?

This determination significantly affected the amount of withdrawal liability Melrose was

required to pay:  If Melrose withdrew in 1999, the amount would be *de minimis*; if, however,

Melrose withdrew in 2010, after the Fund entered critical status, its withdrawal liability would be

much higher.  On the basis of the facts recited above, the Arbitrator found that Melrose's

withdrawal from the Fund occurred in 2010, when it stopped making contributions.  Based on

that finding, the arbitrator affirmed the Fund's assessment of withdrawal liability of $846,613 on

Melrose.

## II.    Applicable Legal Standard

The parties dispute the standard of review applicable to reviewing the Arbitrator's

determination.  Melrose argues that the relevant standard is the one governing decisions of law.

The Fund counters that the relevant standard is the one governing findings of fact.

As to the latter, the MPPAA provides that in reviewing the decision of an arbitrator,

"there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the

findings of fact made by the arbitrator were correct."  29 U.S.C. § 1401(c).  On this basis, as

noted, the Court has reviewed the findings of fact chronicled above and, finding no clear error,

adopted them.  By contrast, the standard of review for decisions of an arbitrator on matters of

law in an MPPAA withdrawal dispute is *de novo*.  *See HOP Energy*, 678 F.3d at 160 (applying

*de novo* standard to review of contract interpretation to determine whether withdrawal liability

exemption applies); *accord Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 804 (2d Cir.

1994) (assuming without deciding that *de novo* standard applies).

As Judge Jones recognized in directing that this dispute be arbitrated:

[F]actual issues lie at the root of Plaintiff's dispute that turn upon when Plaintiff
completely withdrew from Defendant's fund within the meaning of §§ 1381, 1383

and if Defendant gave Plaintiff notice "as soon as practicable" as required by § 1399(b).  Factual issues arising under these MPPAA sections must be decided, and are better decided, by an arbitrator pursuant to § 1401(a).

OTSC Op. 4.  However, the arbitrator's determination as to the date of withdrawal is not a pure finding of fact or a pure question of law.  Rather, as the Supreme Court has noted, "determining the date of 'complete withdrawal' presents not a mere question of fact . . ., but a mixed question of fact and law." *Concrete Pipe & Prods. of Calif., Inc. v. Constr. Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 630 (1993); *see also Tech. Metallurgical Servs., Inc. v. Plumbers & Pipefitters Nat'l Pension Fund*, 213 F. App'x 268, 270 (5th Cir. 2007) ("The determination of the date of complete withdrawal is a mixed question of law and fact.").  And "[w]ith respect to 'mixed questions of law and fact,' the MPPAA contains no explicit standard of review." *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1410 (7th Cir. 1989).

The MPAA does not expressly mandate a standard of review for mixed questions of law and fact, and the Second Circuit has not spoken to this issue.  However, the Court is persuaded that, in MPPAA cases, "[m]ixed questions of law and fact are reviewed for clear error." *Nat'l Pension Plan of UNITE HERE Workers Pension Fund v. Westchester Lace & Textiles, Inc.*, No. 05 Civ. 6138 (RPP), 2006 WL 2051107, at *4 (S.D.N.Y. July 21, 2006) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 488 (7th Cir. 2000)); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Nagy*, 714 F.3d 545, 549 (7th Cir. 2013) ("However, where, as here, there is no right to a jury trial and the only issue before the district court is the characterization of undisputed subsidiary facts, we have held that the clear-error standard of review applies.  Put differently, in these sorts of ERISA cases, we review 'mixed questions of law and fact' under a clearly erroneous standard." (citation omitted)); *Louis Zahn*

8

*Drug Co.*, 890 F.2d at 1411 ("[W]hen the issue is one that requires either fact-finding expertise or where the arbitrator's special expertise in the area of pension law can contribute significantly to the decision, substantial deference ought to be given to the decision of the arbitrator."); *cf. Crown Cork & Seal Co., Inc. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 861 (3d Cir. 1992) ("In reviewing mixed questions such as these, we apply a clearly erroneous standard to findings of fact and conduct plenary review of conclusions of law, applying the appropriate standard to each component.").

Having reviewed the Arbitrator's decision for clear error, the Court has determined that there is none. The Court, accordingly, denies Melrose's motion to vacate the arbitral decision. The Court would, however, reach the same result even if the standard of review was *de novo* and it did not accord any deference to the arbitrator. The Court's reasoning for finding the Arbitrator's decision correct is as follows.

## III.   Discussion

The Arbitrator correctly recognized that "[t]his dispute boils down to this question:  when did Melrose completely withdraw from the Fund?"  Award 12. Melrose argues that it withdrew from the Fund shortly after the CBA expired in January 1999, and that the Union, by refusing to negotiate at that point, effectively disclaimed interest. The Fund counters that Melrose did not withdraw until the Union formally disclaimed interest in 2010.

### A.   Statutory Scheme

The MPPAA requires employers who withdraw from underfunded multiemployer pension plans to pay a "withdrawal liability."  An employer incurs withdrawal liability when it effects a "complete withdrawal" from the plan. The MPPAA defines such withdrawal as follows:  "For purposes of this part, a complete withdrawal from a multiemployer plan occurs

when an employer--(1) permanently ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a).

> The statute also defines "obligation to contribute":
>
> For purposes of this part, the term "obligation to contribute" means an obligation
> to contribute arising--
> (1) under one or more collective bargaining (or related) agreements, or
> (2) as a result of a duty under applicable labor-management relations law, but
> does not include an obligation to pay withdrawal liability under this section or to
> pay delinquent contributions.

29 U.S.C. § 1392(a).[1]

Upon withdrawal, the pension fund must provide notice of withdrawal to the employer

"as soon as practicable" and demand withdrawal payments.  29 U.S.C. § 1399(b).

### B.    Melrose's Obligation to Contribute

Because Melrose did not permanently cease all covered operations under the plan

pursuant to § 1383(a)(2), whether Melrose effected a complete withdrawal from the Fund turns

on whether, pursuant to § 1383(a)(1), it was no longer obligated to make contributions.

It is well-settled that the term "obligation to contribute" "is defined for the purposes of

the withdrawal liability portion of the statute in language that unambiguously includes both the

employer's contractual obligations and any obligation imposed by the [National Labor Relations

Act (NLRA)]."  *Laborers Health & Welfare Trust Fund For N. Calif. v. Advanced Lightweight

Concrete Co., Inc.*, 484 U.S. 539, 545–46 (1988).  It is undisputed that the CBA to which

Melrose had been a party expired in January 1999 and was never renewed.  The decisive

question, then, is whether Melrose had an obligation to contribute as result of a duty under

applicable labor-management relations law.  Under the NLRA, an employer's "contractual duty

---

[1] The statute provides for certain exemptions, such as when the employer ceases contributions
because of a sale of assets.  29 U.S.C. § 1384(a).  These exceptions are not relevant here.

to make contributions to a pension fund" may continue as "a duty . . . to continue making such contributions after the expiration of the contract and while negotiations for a new contract are in process." *Id.* at 541. Melrose's obligation to contribute therefore could have extended past January 31, 1999, when the CBA expired. The question is whether, under the facts, including Melrose's payment of contributions to the Fund for the ensuing 11 years, Melrose's *obligation* to contribute continued after the date.

It is undisputed that Melrose took no affirmative action to withdraw its recognition of the Union (*e.g.*, decertification). The Court therefore next inquires whether an impasse between the parties occurred so as to terminate Melrose's contribution obligation. The Arbitrator found no such impasse. Rather, he found that "Melrose, on the advice of its labor relations attorney, essentially maintained the status quo with respect to pensions (and other benefits), even though no bargaining for a successor agreement ever really commenced. . . . As no bargaining ever took place, despite the efforts of the Employer's attorney, an impasse could not be said to have occurred." Award 13. And, in the absence of an impasse, Melrose's obligation to contribute under the NLRA necessarily continued. *See Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 198 (1991) ("[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." (citing *NLRB v. Katz*, 369 U.S. 736 (1962))); *see also Advanced Lightweight Concrete Co.*, 484 U.S. at 544 n.6 ("[A]ny unilateral change by the employer in the pension fund arrangements provided by an expired agreement is an unfair labor practice.").

*Woodward Sand Co., Inc. v. W. Conference of Teamsters Pension Trust Fund*, 789 F.2d 691 (9th Cir. 1986), is instructive as to this point. In *Woodward Sand*, the CBA between the employer and the union had expired, and the employer continued making contributions despite

the fact that its employees were striking.  The Court found that the obligation to contribute had continued until the parties reached an impasse in negotiations, and the employer stopped contributing, nearly a year later:

> During the negotiations following the expiration of a collective bargaining agreement, the employer is required to maintain the status quo as to wages and working conditions.  The obligation to maintain the status quo encompasses the obligation to continue making pension fund contributions.   The obligation continues until negotiations reach an impasse.

*Woodward Sand*, 789 F.2d at 695 (9th Cir. 1986) (quoting *Producers Dairy Delivery v. W. Conference,* 654 F.2d 625, 627 (9th Cir. 1981)); *see id.* at 697 ("Assuming no impasse had yet occurred, the obligation to contribute . . . had not yet *permanently* ceased because an employer may not unilaterally change employment terms and conditions prior to impasse." (emphasis in original)).  For much the same reasons, the Arbitrator here concluded that Melrose's obligation to contribute continued despite the expired CBA because there had been no impasse, and therefore "Melrose withdrew from the Fund in 2010, when it stopped making monthly contributions in connection with the sale of the business."  Award 14.

To be sure, this case is factually distinguishable from *Woodward Sand*, in that, after January 31, 1999, Melrose was not in active negotiations with the Union.  But that distinction does not change the result.  The Supreme Court's decisions in *Litton* and *Advanced Lightweight Concrete Co.*, *supra*, clearly hold that it is the fact of negotiating to impasse that terminates the obligation to contribute.  Without having done that, Melrose may not unilaterally change the conditions of employment, including contributing to the Fund.

And the absence of negotiations did not leave Melrose powerless to terminate its obligation to contribute:  At any time after January 31, 1999, Melrose could have held an election to decertify the Union, much as the Union, for its part, could have disclaimed interest.

Neither so acted.  Nor, during the ensuing 11 years when it continued to pay into the Fund, did Melrose ever inform the Fund that Melrose's relationship with the Union had ended.  On the contrary, Melrose's continuing payments signaled the opposite.  On this basis, the Arbitrator correctly concluded that the obligation to contribute was ongoing.

Melrose argues that the Union implicitly disclaimed interest by its conduct, in refusing to negotiate in 1999.  But the law is clear that such a disclaimer must be "unequivocal" and "in good faith."  *See* Award 13; *Dycus*, 615 F.2d 826 (collecting cases).  On the evidence before him, the Arbitrator did not find an unequivocal disclaimer of interest by the Union until November 2010 when it stated: "The Union has not had a contract with your Pharmacy for over ten years and the workers have not paid dues for some time, therefore we are disclaiming interest."  Award 11 (quoting Melrose Ex. 8).  Before that point, the Arbitrator noted, the Union had failed to negotiate with Melrose, but it had not otherwise done anything indicating an intent to disclaim.  *Id.* at 14.

That determination is amply supported by the record.  For one thing, Melrose did not treat the Union as having disclaimed:  It continued to be open to negotiations and continued to treat the expired CBA as defining Melrose's duties vis-à-vis the Fund.  And in 2003—four years after the expiration of the CBA—the Fund contacted Detura about a rate increase.  In response, Detura contacted Sager, who informed him that the expired CBA continued to control, but "[w]hen and if they contact me, I will of course meet with them to try and reach an agreement." *Id.* at 8 (quoting Melrose Ex. 8).  This conduct by the Fund, Melrose, and Detura is all sensible if one assumes a continued potential for negotiating a new CBA.  But it is not coherent if, as Melrose contends, the union had in fact disclaimed interest years earlier.

Other statements and actions by Melrose are inconsistent with its claim that it had long treated the Union's failure to negotiate in 1999 as a disclaimer of interest.  In July 2010, for example, Melrose, through its counsel, described Melrose as "*a participating employer* in the 1199 Pension Fund" when seeking a withdrawal liability estimate.  *Id.* at 10 (emphasis added by Arbitrator) (quoting Fund Ex. 10).  Later, Melrose contacted the Union to see if Melrose had any obligations to the Union.  *Id.* at 11.

Most dramatically, Melrose consistently paid contributions into the Fund for 11 years. Meanwhile, Melrose availed itself of the Fund's benefits.  After the CBA expired on January 31, 1999, Melrose continued to notify new hires at the pharmacy of their eligibility for health and pension coverage.  *Id.* at 15.  Between 1999 and 2010, more than a dozen Melrose employees became vested in pension benefits from the Fund.  *See id.* at 11, 17.  These activities belie the argument that Melrose perceived a disclaimer of interest by the Union's conduct.  Rather, as the Arbitrator correctly concluded:  "Having participated for many years, and reaped the rewards of pooling resources with the other participating employers, [Melrose] must also share in the risks of the investment downturn."  *Id.* at 15.

### C.        Statute of Limitations and Laches

At arbitration, Melrose asserted both a statute of limitations defense and a laches defense. Specifically, Melrose contended that (1) the Fund's 2011 claim for withdrawal liability was outside the statute of limitations, because Melrose withdrew in 1999, and (2) the Fund's claim was barred by laches, because the Fund had not provided Melrose with a notice of withdrawal and demand for withdrawal payments "as soon as practicable," as required by 29 U.S.C. § 1399(b).

As to the former defense, the applicable statute of limitations under the MPPAA is six years.  *See Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Calif., Inc.*, 522 U.S. 192, 198 (1997) ("Suit under § 1451 must be filed within the longer of two limitations periods: '6 years after the date on which the cause of action arose,' § 1451(f)(1), or '3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action,' § 1451(f)(2).").  With the Court having held that the date of withdrawal is November 2010, and not January 31, 1999, Melrose's claim that the Fund's assessment of withdrawal liability was untimely is meritless.  The Fund assessed such liability in October 2011—11 months after Melrose's complete withdrawal November 2010, and within substantially less time than the six-year limitations period.

Melrose's laches argument is also unavailing.  Laches is "an equitable defense based on the . . . maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights)."  *Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 259 (2d Cir. 1997) (quoting *Stone v. Williams*, 873 F.2d 620, 623 (2d Cir. 1989)).  "[I]n this Circuit, a defendant must establish three elements to prevail on a laches defense: (1) that he lacked knowledge that the claim might be asserted against him; (2) that the plaintiff delayed asserting the claim despite the opportunity to do so; and (3) that he would be prejudiced if the claim were now allowed to go forward."  *In re Gucci*, 197 F. App'x 58, 60 (2d Cir. 2006) (summary order) (citing *Rapf v. Suffolk Cnty.*, 755 F.2d 282, 292 (2d Cir. 1985)).  Although laches is not generally a defense where the action is filed within the statute of limitations, it may be available under the MPPAA where a plan did not notify an employer "as soon as practicable" after withdrawal, even if still within the statute of limitations.  *See Amalgamated Lithographers of Am. v. Unz & Co. Inc.*, 670 F. Supp. 2d 214, 228–29 (S.D.N.Y. 2009) (collecting cases).

15

The Arbitrator here expressly addressed—and rejected—Melrose's laches argument.  *See* Award 17.  The Arbitrator noted that the Fund had demanded withdrawal payments less than a year after Melrose withdrew (*i.e.*, in 2010, when it stopped making monthly contributions).  The Court joins the Arbitrator's analysis.  Although "there is no hard and fast rule for what constitutes 'as soon as practicable,'" *Amalgamated Lithographers of Am.*, 670 F. Supp. 2d at 229 (collecting cases), notice within one year is clearly within the reasonable period contemplated by the statute.  Notably, the Supreme Court has held that the MPPAA provides an accommodating, flexible time period in which to assess withdrawal liability:

> Notably, Congress adopted specific time limits to govern a number of other steps in the assessment and collection process.  Congress' adoption of a looser "as soon as practicable" requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment.

*Ferbar Corp.*, 522 U.S. at 204–05; *see also ILGWU Nat. Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 887 (2d Cir. 1988) ("This action was commenced well within the six-year statutue of limitations under 29 U.S.C. § 1451(f), and in light of the complexity of the tasks imposed on the Fund under the statute and Congress' clear intent to *help* plans collect withdrawal liability, we cannot say that appellants' delay was so unreasonable as to support a defense of laches." (emphasis in original)).  Under this flexible standard, there is no basis to find that the Fund, in taking 11 months to assert its claim to withdrawal liability, unreasonably delayed.  In any event, as the Arbitrator noted, Melrose's own conduct in availing itself of the benefits of the Fund for years while paying into the Fund at the long-expired rate, as described above, undermines its bid for equitable relief such as laches.  *See* Award 17; *see also Chesapeake Energy Corp. v. Bank of*

*N.Y. Mellon Trust Co.*, No. 13 Civ. 1582 (PAE), 2013 WL 1890278, at *49 (S.D.N.Y. May 8, 2013) ("In considering a laches defense, the Court also considers the equities . . . .").[2]

## CONCLUSION

For the reasons stated above, Melrose's motion to vacate the Arbitrator's award is denied. The Clerk of Court is directed to terminate the motion pending at docket number 27.

An application to confirm the award is pending before the Hon. Lorna G. Schofield. *See* No. 12 Civ. 7524. Accordingly, the Court has no occasion to address whether confirmation of the Arbitrator's Award is appropriate. The Court having resolved the limited question before it, the Clerk of Court is directed to close the case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: August 8, 2013
        New York, New York

---

[2] Defendants separately argue that Melrose's motion fails on an alternate, procedural basis—that Melrose failed to file a separate suit (and pay the associated filing fee) to vacate the arbitral award. *See* Def. Br. 5–10. Having decided in defendants' favor on the merits, the Court need not reach this exceedingly technical objection, save to note its extreme skepticism of it. Judge Jones referred this matter to arbitration, and stayed the case pending the arbitration's outcome. *See* Dkt. 22. With a case involving this precise dispute already pending, it would undermine judicial economy (and common sense) to demand that Melrose file an additional lawsuit and to require dismissal of this one for failure to do so. No case cited by defendants dictate a contrary outcome.